UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ANDREW GOLD,                                            :
     Plaintiff,                                 :
                                                       :
    v.                                         :       C.A. No. 17-104WES
                                                       :
JAMES POCCIA, BENJAMIN SEDAM,                           :
DAVID NELSON, RANDY POLION, and                         :
THE TOWN OF COVENTRY, through its                       :
Finance Director, ROBERT THIBEAULT,                     :
     Defendants.                                :

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

Now pending before the Court is Defendants' motion for summary judgment, ECF No. 14, which has been referred to me for report and recommendation. The motion challenges the sufficiency of the facts supporting the claims stated in the Third Amended Verified Complaint ("Complaint").[1] In his Complaint, *pro se*[2] Plaintiff Andrew Gold contends that his Fourth and Fifth Amendment rights were violated on February 20, 2014, when Coventry police officer James Poccia, serving as a "peace detail" and acting with guidance from Lieutenant Benjamin

---

[1] When the motion for summary judgment was filed, the operative pleading was the Second Amended Complaint (ECF No. 11-2). After the Third Amended Verified Complaint was filed, the parties stipulated that the motion for summary judgment be construed as seeking summary judgment on the new version of the complaint. ECF No. 26.

[2] Mr. Gold is trained as a lawyer and was admitted to practice as an attorney in the Rhode Island state courts and before this Court. In 1999, aware that he was the subject of an investigation of professional misconduct, he consented to disbarment. In re Gold, 733 A.2d 731 (R.I. 1999). Pursuant to this Court's Local Rule (DRI LR Gen 214), his right to practice here was revoked at the same time. At the hearing on the motion for summary judgment, the Court inquired whether Mr. Gold contends that, as a disbarred attorney, he is entitled to the leniency normally afforded to *pro se* litigants. See Villalobos v. United States, Civil Action No. 1:17-90, 2018 WL 2248517, at *9 (S.D. Tx. March 27, 2018) (attorney whose license revoked due to criminal conviction not afforded *pro se* leniency); Firestone Fin., LLC v. Meyer, Case No. 13-cv-07241, 2017 WL 714110, at *7 (disbarred attorney does not enjoy leniency afforded typical *pro se* litigants). In response to the Court's inquiry, Mr. Gold agreed that such leniency would not be appropriate. In reliance on this response, the Court has analyzed his filings with leniency only to the extent that it has been some years since Mr. Gold actively practiced.

Sedam, intervened by threatening arrest to compel Mr. Gold to relinquish to his former employer (who is also his mother) a cell phone that Mr. Gold claimed was his personal property.  Initially, Mr. Gold sued four Coventry police officers and the Town of Coventry through its finance director Robert Thibeault.  During the hearing, Mr. Gold conceded that there is no evidence that two of the Coventry police officers (Officers Nelson and Polion) participated in the conduct that forms the basis for his claims; similarly, he agreed that he cannot marshal evidence to establish the pattern or practice[3] essential for municipal liability against the Town of Coventry[4] pursuant to Monnell v. City of New York Department of Social Services, 436 U.S. 658 (1978).  Accordingly, based on the Court's review of the record and on Mr. Gold's acquiescence, I recommend that summary judgment enter in favor of these Defendants.

That leaves Officer Poccia and Lieutenant Sedam of the Coventry police.  Both are sued under 42 U.S.C. § 1983, individually and in their official capacities, for money damages based on alleged violations of the Fourth and Fifth Amendments stemming from the unlawful arrest of Mr. Gold, and the improper seizure of his cell phone and the data in his cell phone and computer, which were accessed by Mr. Gold's mother after the departure of the Coventry police.  Mr. Gold has also brought state law claims against Officer Poccia and Lieutenant Sedam for extortion,

---

[3] Mr. Gold agreed that the evidence he presented actually proves the opposite.  With his opposition to the motion, he filed hundreds of pages of police logs, which uniformly reflect that, when acting as "peace detail," Coventry police refrain from intervening when there is a disagreement over property ownership, instead they usually only remind the persons involved to keep the peace and to handle the dispute civilly.  See ECF Nos. 32 (392 pages from the police log), 39 (police logs culled for similar incidents).

[4] The Town of Coventry is sued "through its Finance Director, Robert Thibeault."  Since Mr. Gold has proffered no evidence suggesting that the Town's finance director participated in any of the challenged events, it is clear that he is named in an official capacity effectively as an alter ego of the Town.  Reis v. Lombardi, C.A. No. 15-423ML, 2016 WL 1626664, at *1 & nn.1-2 (D.R.I. March 16, 2016), adopted, 2016 WL 1611116 (D.R.I. Apr. 21, 2016) (suit against senior official in official capacity is same as suit against municipality).  With no facts to support municipal liability, I recommend that the Court enter judgment in favor of the "Town of Coventry through its Finance Director, Robert Thibeault."  Id. at *1 n.4.

larceny, computer theft and tampering, and conspiracy in violation of various Rhode Island statutes.

Defendants Poccia and Sedam argue that the facts fail to establish a Fourth or Fifth Amendment violation based on either the alleged arrest of Mr. Gold or the seizure of the cell phone and the subsequent accessing of data. Further, they contend, even if the Court were to find such a violation, the officers are protected by qualified immunity. They also argue that the state law claims fail not only because of the dearth of facts establishing that the Coventry police were involved in the seizure or theft of data but also because most of the statutes pled by Mr. Gold do not support a private right of action. Finally, Defendants ask the Court to enter judgment based on the applicable statute of limitations because, except for the claim of false arrest, none of the other claims were asserted until more than three years after February 20, 2014. They contend that Fed. R. Civ. P. 15(c)'s relation back doctrine should not apply to cure this deficiency.

Marshaling an array of potentially admissible evidence, including his own declaration and one from a percipient witness to the allegedly actionable events, Mr. Gold opposes the motion, arguing that there are material issues of fact that require that his claims proceed to trial.

Based on the analysis that follows, I recommend that Defendants' motion be granted in part and denied in part.

## I.      BACKGROUND

In his declaration, Mr. Gold states that he worked for his mother, Sheila Gold, at her business, ShelaLara Vineyard and Winery ("ShelaLara Vineyard"), beginning in 2003. ECF No. 40 ¶ 4. In 2011, he, his mother and his brother (also working at ShelaLara Vineyard) switched from individually-owned devices to Apple products for conducting ShelaLara Vineyard business.

Id. ¶ 9.  Sheila Gold purchased three cell phones, causing each one to be invoiced in each of their three names.  Id. ¶¶ 12-16.  Because of an error committed by Apple, Mr. Gold received the cell phone invoiced in the name of his brother.  Id. ¶¶ 18, 22-27.  After Sheila Gold purchased the device, ShelaLara Vineyard paid the monthly charges for Mr. Gold's phone.  Id. ¶¶ 19-20; ECF No. 15-6.  The only evidence supporting Mr. Gold's claim of ownership of the cell phone is his sworn statement that "Sheila Gold delivered possession of the cellphone to me with the statement that it was mine ('for you'), without any qualifications as to its ownership," as well as that it was her "gift" in consideration for the work he did for ShelaLara Vineyard for insufficient compensation.  ECF No. 40 ¶ 29-30; see ECF No. 15-5 at 9 (in Interrogatory Response 14, Mr. Gold avers, "Plaintiff considered the phone to be a gift, and makes no other admission").

At some point in early 2014, Mr. Gold stopped working at ShelaLara Vineyard.  Whether he was fired or quit is not revealed by the record; in his declaration, he avers that, by February 11, 2014, his mother had locked him out.  ECF No. 40 ¶¶ 41-42.  On February 20, 2014, Mr. Gold states that he returned to ShelaLara Vineyard at his mother's behest to meet her there to complete the labelling of thirty cases of wine.  He avers that she lured him there for the purpose of getting the cell phone with the (false) promise that she would consider returning some of his clothing if he came and worked.[5]  Id. ¶¶ 60-62.  When the four-hour task was complete, Plaintiff went to the parking lot to use the phone (Sheila Gold had terminated his WiFi access).  Id. ¶ 69.  There, he was confronted by an individual known by him to be a private investigator retained by his late father's attorney.  Id. ¶¶ 71-72.  At some point, Sheila Gold also came to the parking lot.  Id. ¶ 109.  The private investigator said to Mr. Gold, "I want the cell phone"; he also demanded

---

[5] As long as he was working at ShelaLara Vineyard, Mr. Gold was also living in his mother's home.  When she locked him out of the workplace, she also excluded him from her home and held his clothing hostage.  ECF No. 40 ¶¶ 29, 40, 44.

that Mr. Gold not erase data stored on the device.  Id. ¶¶ 71, 77.  Mr. Gold refused to turn it over, saying it was his own, but agreed that he would not erase any data.  Id. ¶ 73, 78.

Immediately after this, a Coventry police squad car entered the parking lot and blocked the exit; Officer Poccia got out and approached Mr. Gold.  Id. ¶¶ 80-81.  It is undisputed that Officer Poccia was sent as a "peace officer detail," in response to a request made by Sheila Gold and/or the private investigator, who told Lieutenant Sedam that the peace detail was needed because the investigator was going to "retrieve personal property from a client's son, Andrew." ECF No. 1-3 (police log).  Nor does Mr. Gold dispute Officer Poccia's interrogatory answer averring that he had been told that Mr. Gold was being terminated by the company and that the cell phone was company property; Officer Poccia understood that his task was to stand by, keep the peace and issue a no-trespass warning.  Id.; ECF No. 33 at 5.

The parties' versions of what happened next diverge materially.

Officer Poccia avers that he was standing aside and heard Mr. Gold admit that the cell phone belonged to the company but refuse to return it, saying that he would do so the following day after he removed certain personal information.  ECF No. 33 at 4.  He also heard Sheila Gold say that the cell phone might have proprietary information and that it must be relinquished immediately.  Id.  Officer Poccia then asked Mr. Gold to turn it over; when Mr. Gold persisted in refusing, Officer Poccia called Lieutenant Sedam for instructions.  Id.  Lieutenant Sedam told Officer Poccia not to allow Mr. Gold to leave the premises with company property and, if necessary, to take him into custody.  Id. at 5-6.  Officer Poccia complied, threatening Mr. Gold with arrest if he did not turn over the cell phone.  Id. at 6.  Mr. Gold finally gave the cell phone to Officer Poccia, who handed it to Sheila Gold.  Officer Poccia warned Mr. Gold not to return to

ShelaLara Vineyard.   He then left the premises, as did Officer Polion who had arrived to assist. Id.

Mr. Gold's version of these events is set forth in his own declaration (ECF No. 40) and in a declaration from Daniel Smiley (ECF No. 28), who was working nearby and saw and heard the pivotal events.  They aver that Mr. Gold told the private investigator, and repeatedly said directly to Officer Poccia, that the cell phone was his.  ECF No. 28 ¶¶ 8, 13, 17; ECF No. 40 ¶ 98. Despite the competing claims of ownership, Officer Poccia asked no questions about ownership and did not ask to view any documents that might establish ownership, although he did ask Sheila Gold about Mr. Gold's employment status and she stated, "He's fired!"  ECF No. 28 ¶¶ 23-24; ECF No. 40 ¶¶ 92, 111-113.  Mr. Smiley and Mr. Gold also confirm that Mr. Gold said that he would turn over the cell phone to his mother the next day, after he deleted his personal information.  ECF No. 28 ¶ 16; ECF No. 15-5 at 12 (Gold Interrogatory Answers).  Mr. Gold asked for an opportunity to call his attorney, but Officer Poccia refused.  ECF No. 40 ¶ 100.  Mr. Gold and Mr. Smiley both aver that Officer Poccia angrily and repeatedly threatened to handcuff and arrest Mr. Gold and take him to jail unless he relinquished the cell phone.  ECF No. 28 ¶¶ 15, 19, 25; ECF No. 40 ¶¶ 90, 99, 102-04.  Frightened by these threats, Mr. Gold handed his cell phone to Officer Poccia, who gave it to the private investigator.  Id. ¶¶ 105-06.  Officer Poccia then demanded that Mr. Gold disclose the private password to "unlock" the cell phone.  Id. ¶ 107.  Mr. Gold refused and did not provide any password or other access code as long as Officer Poccia was present.  Id. ¶ 108.  Officer Poccia warned Mr. Gold not to reenter the premises of ShelaLara Vineyard.  Id. ¶ 116.  After the Coventry police were no longer involved, the Complaint alleges that Sheila Gold accessed data from the cell phone, as well as from other

6

devices and accounts of Mr. Gold.[6]  ECF No. 18-1 ¶ 28.  Mr. Gold admits that the Coventry police did not access any of this data.  ECF No. 42 at 9.

The family/business dispute that underlies the events of February 20, 2014, erupted into litigation less than a year later.  In January 2015, a case was filed in this Court, pitting Sheila Gold and ShelaLara Vineyard, against her son, Mr. Gold, his business associate Dan Ribeiro and their newly-formed competing business, the Purple Cat Vineyard and Winery ("Purple Cat").  ShelaLara Vineyard and Winery v. The Purple Cat Vineyard and Winery, C.A.15-01JJM ("ShelaLara Case").  Sheila Gold and ShelaLara Vineyard claimed that Mr. Gold and his colleague stole trade secrets and committed other wrongful acts, including the establishment of the Purple Cat as a competing business using the secrets of ShelaLara Vineyard.  Mr. Gold's counterclaim focused, *inter alia*, on his mother's hacking into and interference with his electronic accounts, devices and data, including the seizure of his cell phone on February 20, 2014.  ECF No. 15-3 ¶¶ 53, 69-82, 86-88, 96.  The ShelaLara Case culminated in a 2017 jury trial, resulting in a verdict against Mr. Gold, his business associate and the Purple Cat and in favor of his mother, Sheila Gold and ShelaLara Vineyard.  See ECF No. 15-4[7] (jury verdict form).  Specifically, the jury found that Mr. Gold, his associate and the Purple Cat misappropriated trade secrets, breached a confidentiality agreement and converted assets, injuring ShelaLara Vineyard in the amount of $300,000; the jury award also included punitive damages of $25,000 assessed against Mr. Gold (other punitive awards were assessed against Mr. Gold's codefendants).  Id.  The jury rejected Mr. Gold's counterclaim, finding that he did not

---

[6] Inconsistently, in his counterclaim in the ShelaLara Case (included as an exhibit to Defendants' Statement of Undisputed Facts herein), Mr. Gold alleges that Sheila Gold and ShelaLara Vineyard had already hacked into Mr. Gold's email accounts, "prior to" February 20, 2014.  ECF No. 15-3 ¶ 53.

[7] The jury verdict form from the ShelaLara Case is filed in this case at ECF No. 15-4.  Except as otherwise indicated, the matters of record in the ShelaLara Case which have been refiled in this case are cited with the docket entries in this case.

sustain a wage injury and was not wrongfully evicted by his mother from her home.  Id. at 4-5.

Pertinent to the instant case is the jury's finding that neither ShelaLara Vineyard nor Sheila Gold

accessed Mr. Gold's computer or his cell phone without authority, nor did she or the company

access his computer for the purpose of fraud.  Id. at 4.  This judgment is not final – Mr. Gold has

appealed; as of this writing that appeal is pending.[8]  First Circuit Case Number 17-1987.

Precisely three years after the February 20, 2014, incident, Mr. Gold initiated this case by

filing the original complaint in Superior Court.  After removal, Defendants filed the instant

motion for summary judgment.

## II.    STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, summary judgment is appropriate if the pleadings, the

discovery, disclosure materials and declarations show that there is "no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."  Taylor v. Am.

Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009); Commercial Union Ins. Co. v. Pesante, 459

F.3d 34, 37 (1st Cir. 2006) (quoting Fed. R. Civ. P. 56(c)).  A fact is material only if it possesses

the capacity to sway the outcome of the litigation; a dispute is genuine if the evidence about the

fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.

Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010); Santiago-Ramos v. Centennial P.R.

Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227

---

[8] In connection with his opposition to the motion for summary judgment, Mr. Gold filed and extensively briefed what he styled as a motion in limine.  ECF No. 20.  In violation of the Court's Local Rules, he filed seriatim, and without leave of Court, three memoranda supporting the motion in limine.  ECF Nos. 20-1, 23, 24.  The motion in limine essentially sought to relitigate the ShelaLara Case, arguing that the Court should strike all references to it and should decline to apply the doctrine of collateral estoppel in deciding the motion for summary judgment.  The motion in limine's core premise is flawed – Defendants have consistently acknowledged that the ShelaLara Case findings are not final because an appeal is pending and they have not relied on collateral estoppel.  E.g., ECF No. 14-1, at 16-17 & n.12.  For that reason, as well as because of Mr. Gold's pervasive disregard of the Local Rules in briefing the motion in limine, because the motion in limine is procedurally defective, Masello v. Stanley Works, Inc., 825 F. Supp. 2d 308, 314 n.6 (D.N.H. 2011), and for the reasons stated on the record at the hearing, the motion in limine was denied.  Text Order of June 13, 2018.

(1st Cir. 1996)).  The evidence must be in a form that permits the court to conclude that it will be admissible at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  In ruling on a motion for summary judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party."  Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000) (citing Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 672 (1st Cir. 1996)).  There are no trial-worthy issues unless there is competent evidence to enable a finding favorable to the nonmoving party.  Goldman v. First Nat'l Bank of Bos., 985 F.2d 1113, 1116 (1st Cir. 1993).  That is, the nonmoving party cannot rest on its pleadings, but must "set forth specific facts demonstrating that there is a genuine issue for trial" as to the claim that is the subject of the summary judgment motion.  Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988).

## III.    LAW AND ANALYSIS

Defendants argue that, although Mr. Gold has proffered declarations and other potentially admissible evidence, the facts nevertheless fail to create a trial-worthy issue regarding whether Mr. Gold's cell phone was wrongfully seized, whether Mr. Gold himself was wrongfully arrested, or whether Coventry Police officers are legally responsible for the post-seizure hacking of Mr. Gold's data by Sheila Gold (which the ShelaLara Case jury found was not wrongful).  They contend further that, even if there was a constitutional violation, the officers are immune from suit because a reasonable police officer in their position would not have believed that their actions infringed upon clearly established rights.  In addition, they argue that all of Mr. Gold's claims, except for wrongful arrest, are time barred on the grounds that they were not asserted until the First Amended Complaint was filed in December 2017 and do not relate back to

9

Plaintiff's original complaint. Finally, Defendants challenge the viability of Mr. Gold's state-law claims.

### A.    Alleged Unconstitutional Seizure of Cell Phone

In order to succeed on the Fourth Amendment claim arising from the seizure of the cell phone, Mr. Gold must show that (1) Defendants seized his property, and (2) that the seizure was unreasonable. Chopmist Hill Fire Dep't v. Town of Scituate, C.A. No. 09-531-ML, 2012 WL 2521104, at *3 (D.R.I. June 28, 2012). To prevail on his Fifth Amendment claim, Mr. Gold must prove that he was deprived of his property without due process of law. When property is seized because it was allegedly stolen or belongs to another, compliance with the Fourth Amendment also serves to fulfill the requirements of procedural due process. Sanders v. City of San Diego, 93 F.3d 1423, 1428 & n.7 (9th Cir. 1996) (citing Soldal v. Cook Cty., Ill., 506 U.S. 56, 70-71 (1992) (general protection of property under the Due Process Clause of Fifth and Fourteenth Amendments also protects against unreasonable seizures)). In light of the alignment of the applicable analyses, the parties' briefs and arguments have developed only the Fourth Amendment claim; I have followed suit. That is, because Mr. Gold's Fifth Amendment claims rise or fall with those arising under the Fourth Amendment, I do not separately discuss the Fifth Amendment.

A threshold issue on which Defendants focus is whether the cell phone was Mr. Gold's property, so as to trigger Fourth Amendment rights. For starters, the facts establish that Mr. Gold possessed and was using the phone. In addition, Mr. Gold claims, and Officer Poccia agrees, that Mr. Gold told him that the cell phone contained his personal information so that Officer Poccia knew that he claimed a privacy interest in the phone. Further, a fact finder could conclude that Mr. Gold never conceded in Officer Poccia's presence that the cell phone was

10

owned by ShelaLara Vineyard, but rather that he persistently told Officer Poccia that the phone belonged to him.  The parties dispute what Mr. Gold said about ownership of the phone: Officer Poccia swears that he heard Mr. Gold concede that the phone belonged to the company while Mr. Gold and Mr. Smiley swear that Mr. Gold repeatedly said the phone was his.  Nor has Officer Poccia alleged any facts that would support a reasonable belief on his part that Mr. Gold was lying when he claimed that the phone contained his personal information or when he asserted ownership of the phone.  See D.C. v. Wesby, 138 S. Ct. 577, 592 (2018) (in finding probable cause to arrest party-goers, reasonable for officers to disbelieve explanations that are inherently or circumstantially implausible).

As to the ultimate truth of Mr. Gold's statement to Officer Poccia that the cell phone was his, the factual record is a muddle.  At best, Mr. Gold cagily swears only that he believed the cell phone to be his mother's "gift," and admits that it was purchased and paid for by Sheila Gold and ShelaLara Vineyard; also in the background is the post-seizure jury verdict upholding the authority of Sheila Gold and ShelaLara Vineyard to seize the cell phone and access its data and the data in Mr. Gold's other devices, and rejecting Mr. Gold's claim that these actions were wrongful.  Mr. Gold undermines his claim of ownership by his admission that he offered to return the phone the next day.  Nevertheless, these are factual disputes that will turn on credibility assessments.  That is, it remains possible that Mr. Gold's claim of disputed ownership will be found to be credible; a fact finder could conclude not only that he had a lawful possessory interest in the phone and a privacy interest in at least some of its content,[9] but also that he

---

[9] The Court is mindful of the special status of cell phones in Fourth Amendment jurisprudence.  Recently, the Supreme Court held that "[c]ell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person," because they create the potential for an unprecedented intrusion on privacy when they are seized.  Riley v. California, 134 S. Ct. 2473, 2489-90 (2014) (holding that before searching cell phone seized incident to arrest law enforcement must get a warrant).  Also instructive for this case is the Supreme Court's even more recent decision in Carpenter v. United States, holding that a warrant is required before law enforcement can access cell phone location records from a third-party provider.  No. 16-402, slip op. June 22, 2018.

reasonably and correctly believed himself to be the owner by gift.  This is more than enough to trigger Fourth Amendment constitutional protections.  Dixon v. Lowery, 302 F.3d 857, 862 (8th Cir. 2002) ("A seizure of property occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'") (quoting Soldal, 506 U.S. at 61-62). Moreover, even if Mr. Gold's claim of exclusive ownership is not sustained, as the Supreme Court most recently clarified, legal possession, coupled with a reasonable expectation of privacy, may be sufficient to implicate the Fourth Amendment.  Byrd v. United States, 138 S. Ct. 1518, 1528 (2018) ("expectation of privacy that comes from lawful possession and control and the attendant right to exclude" potentially triggers Fourth Amendment protections; fact that rental car driver was not listed on rental agreement does not defeat an otherwise reasonable right of possession and related expectation of privacy).

Turning to the merits, the Court begins with the Supreme Court's seminal decision in Soldal, which lays down the applicable principles.  Soldal holds that, when sheriffs prevented the residents of a trailer home from interfering with the trailer park owner's civil eviction of them by seizing and dragging away their trailer home without a court order, the sheriffs' conduct converted the private eviction into a seizure carried out under color of state law.  Consequently, the sheriffs were required to conform to the strictures of the Fourth Amendment.  Id. at 70-72. As the Court described the facts:

> [R]espondents, acting under color of state law, dispossessed the Soldals of their trailer home by physically tearing it from its foundation and towing it to another lot.  Taking these allegations as true, this was no "garden-variety" landlord-tenant or commercial dispute.  The facts alleged suffice to constitute a "seizure" within the meaning of the Fourth Amendment, for they plainly implicate the interests protected by that provision.

Id. at 72.  Emphasizing that the reasonableness of the sheriffs' conduct "is still the ultimate standard," the Court held that, had there been a court order of eviction, a showing of

12

unreasonableness "would be a laborious task indeed." Id. at 71. However, when state officials "proceed to seize property in the absence of objectively reasonable grounds for doing so," the Fourth Amendment is transgressed. Id. at 71-72.

In the wake of Soldal, it has become well established that the seizure of property, even if believed to be stolen, must comply with the Fourth Amendment in that the seizure must be reasonable. Sanders, 93 F.3d at 1428. For example, in Dixon, 302 F.3d 857, a plaintiff possessed and was operating a restaurant that was the subject of a disputed sales agreement, leading to a factual dispute as to whether he was the owner or had the right of sole possession. Id. at 863. Despite what the court found was "an apparent property dispute," the police officers, who had been contacted by the other party, essentially "chose to decide on the spot who should prevail." Id. at 863-64. With no warrant, no court order and no exigency, the officer's seizure of property was held to be unreasonable. Id. at 865-66 ("law enforcement officers are not the appropriate arbiters of these disputed interests").

More recently, the Sixth Circuit considered the actions of police who facilitated the seizure by one family member of a car that had been the subject of an ongoing family ownership dispute. Middaugh v. City of Three Rivers, 684 F. App'x 522, 524-25 (6th Cir. 2017). The court considered what level of police involvement was sufficient to transform an otherwise private act of repossession into state action and held that, while mere presence of the officers to keep the peace is insufficient, when they take an active role by affirmatively intervening to aid the repossessor, state action is implicated and police must comply with constitutional strictures. Id. at 527-28. And when there are plausible competing claims of ownership, the court held that a seizure that favors one claimant over another is not reasonable. Id. at 529.

13

Based on the foregoing, I find that there is a trial-worthy issue of fact regarding the nature of Mr. Gold's interest in the cell phone. I further find that the coercion by Officer Poccia – threats of arrest, handcuffs and jail – is enough to convert the seizure of Mr. Gold's cell phone into state action, and that Officer Poccia was aware of Mr. Gold's possessory interest in the cell phone, including that he claimed to have private information stored on it. I also find that there is a material factual dispute regarding the reasonableness of the seizure based on Mr. Gold's claim that Officer Poccia knew that there was a credible dispute over ownership of the cell phone. As in Soldal and Middaugh, a fact finder could conclude that Officer Poccia, based on the instruction from Lieutenant Sedam, aggressively acted under color of state law to effectuate a seizure of property that, based on the totality of the circumstances, was not reasonable because ownership of the device was credibly disputed or because there was a credible claim that the device contained private information and no exigency justified the immediate seizure.

That leaves the question of qualified immunity. Qualified immunity is an affirmative defense that protects police from lawsuits under § 1983 unless (1) the unlawfulness of the conduct was clearly established at the time of the actionable events; and (2) an objectively reasonable official would have believed that his action violated the clearly established right. Wilson v. City of Bos., 421 F.3d 45, 52 (1st Cir. 2005); see Hensley v. Gassman, 693 F.3d 681, 693-94 (6th Cir. 2012). Qualified immunity usually turns on objective circumstances, not subjective intent; this means objective circumstances actually known to the officer. Bilida v. McCleod, 211 F.3d 166, 174 (1st Cir. 2000) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982)). "Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists (e.g. a

14

warrant, probable cause, exigent circumstances).” Bilida, 211 F.3d at 174-75. If the constitutional barrier is debatable, police are then protected from suit by the doctrine of qualified immunity. Mullenix v. Luna, 136 S. Ct. 305, 312 (2015). Thus, even if a seizure is improper, as long as the circumstances caused the police to conclude, reasonably but mistakenly, that the seizure was appropriate, qualified immunity bars the claim. Wesby, 138 S. Ct. at 590 (“existing precedent must place the lawfulness of the particular arrest ‘beyond debate’”); Allin v. City of Springfield, 845 F.3d 858, 863 (7th Cir. 2017) (qualified immunity protects officers who, faced with disputed claims of ownership of motorcycle, ran title searches, reviewed certificate of title, questioned competing claimants, and ultimately supported defendant’s ownership claim).

In Middaugh, the Sixth Circuit considered the role of qualified immunity in a case where the court had found that, by participating at the request of one family member in the seizure of a car whose ownership was the subject of a family fight, police crossed the line into state action resulting in an unreasonable seizure in violation of the Fourth Amendment. 684 F. App’x at 528-29. However, the court nevertheless found in favor of the police based on qualified immunity. Middaugh focuses on the officers’ “particular conduct,” which involved passively assisting in the seizure of the car without verifying the ownership claim on which the seizure was based. Id. at 529. The court held that qualified immunity must end the suit because “clearly established precedents” governing the conduct of officers at the time prohibited physical interventions or threats, to which the Middaugh officers had not resorted. Id. at 530 (citing Cochran v. Gilliam, 656 F.3d 300, 306 (6th Cir. 2011) (threat of arrest), and Hensley, 693 F.3d at 691-92 (brandishment of gun and use of physical force)). Pivotal to the Middaugh holding was that “the Officers neither threatened arrest nor used force.” Id.

In this case, the issue of qualified immunity is not susceptible of summary judgment. Since Soldad, it has been well established that it is unreasonable for police to pick sides in a civil property dispute and use the color of state law to dispossess an individual of property, based only on the unsupported (for example, by court order) ownership claim of another.  Further, Officer Poccia's threat of arrest unambiguously distinguishes this case from Middaugh, where the police intervention did not reach a level of coercion such that it transgressed clearly established law.

It remains possible that a fact finder will accept Officer Poccia's version, particularly his claim that Mr. Gold affirmed that the device was a company cell phone, leaving only the potential constitutional violation arising from the seizure of a receptacle that contained Mr. Gold's private information.  It is also possible that further factual development will reveal that Officer Poccia (or Lieutenant Sedam) confronted an "abundance of evidence" undermining Mr. Gold's claim of ownership and a "paucity of evidence" supporting it, such that it was reasonable for Officer Poccia to disbelieve or disregard Mr. Gold's insistence that the phone was his.  See Higgins v. Penobscot Cty. Sheriff's Dep't, 446 F.3d 11, 14-15 (1st Cir. 2006) (if facts confronting officer render objectively reasonable his judgment that situation was dangerous and other family members' claim of ownership well founded, while plaintiff's claim of ownership not credible, qualified immunity protects him from suit).  In either event, the particular circumstances of this seizure, which preceded Riley's and Carpenter's holdings about the special status of cell phones under the Fourth Amendment, as well as Byrd's holding about the applicability of the Fourth Amendment rights in the absence of a documented right to possess, may well result in dismissal based on qualified immunity.  This is particularly true if the facts establish that Coventry police had been presented with a credible claim by an employer that a device with business-owned information had been issued to a now-terminated employee who

was refusing to return what he knew to be company property.  See City of Ontario v. Quon, 560 U.S. 746, 763 (2010) (despite potentially well-founded expectation of privacy in contents of device, police search of employer-owned device reasonable and does not violate Fourth Amendment).

For now, however, fact issues abound and the claim should proceed.[10]  See Morse v. Cloutier, 869 F.3d 16, 30 (1st Cir. 2017) ("on this scumbled record, the officers involved in that arrest are not entitled to qualified immunity at the summary judgment stage"); Gericke v. Begin, 753 F.3d 1, 10 n.13 (1st Cir. 2014) (if determination of qualified immunity requires credibility assessment, summary judgment is not proper).  I so recommend.

Before closing the summary-judgment book on the cell phone seizure claim, the Court turns to Defendants' argument that it is time barred because the Fourth and Fifth Amendments were not mentioned as its basis until the First Amended Complaint, which was filed more than three years after the February 20, 2014, incident.  The argument may be given short shrift.  The original complaint was timely filed; it clearly was based on (unspecified) constitutional violations in that it relies on § 1983 and it plainly sets out the applicable factual pattern – that Mr. Gold's cell phone, which he told police was his and contained his personal information, was seized on February 20, 2014, by Coventry police officers who threatened him with arrest.  ECF No. 1-3 ¶¶ 6-8.  While the legal claims in the original complaint are stated as "falsely arrest, falsely imprison; and slander," and the Fourth and Fifth Amendments were not mentioned until the First Amended Complaint,[11] Fed. R. Civ. P. 15(c)(1)(B) provides that the amended pleading

---

[10] A defendant asserting a qualified immunity defense may obtain interlocutory review of a denial of his motion for summary judgment, even if the district court concluded that the record presented a genuine dispute of material fact, as long as he accepts as true the plaintiff's version of the facts and argues that he is entitled to qualified immunity on that version of the facts.  Morse v. Cloutier, 869 F.3d 16, 25 (1st Cir. 2017).

[11] The original complaint did mention 42 U.S.C. § 1983, but did not identify what provisions of the constitution allegedly were violated.

relates back if the amendment "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading."  The original complaint lays out the precise same § 1983 fact pattern – "conduct, transaction or occurrence" – that is in issue now, except that it is now clear that this § 1983 claim is asserted under the Fourth and Fifth Amendments.[12]  See Marsman v. W. Elec. Co., 719 F. Supp. 1128, 1143 (D. Mass. 1988) (only if defendant placed on notice of general fact pattern by original complaint does relation back apply).  Therefore, it is more than sufficient to trigger relation back. I do not recommend that the Court enter judgment on Mr. Gold's Fourth and Fifth Amendment claims arising from the seizure of the cell phone because they are time barred.

### B.     Alleged Unconstitutional Arrest of Mr. Gold

Mr. Gold's claim that he was the victim of an unconstitutional arrest fails because the undisputed facts establish only a threat of arrest, not an actual or *de facto* arrest, in that he was free at all times to leave, as soon as he surrendered the cell phone.  See Zappa v. Gonzalez, 819 F.3d 1002, 1006 (7th Cir. 2016) (dismissal of Fourth Amendment claim based on lack of interference with person or property; "the worst that happened was a threat of arrest, to which [plaintiff] responded by returning the motorcycle to the Lake Zurich police") (emphasis added). As the First Circuit held in United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994), there is no scientifically precise formula that enables courts to distinguish between an interaction with law enforcement and the kind of detention that the law deems sufficiently coercive to require probable cause – detentions that are sometimes called "*de facto* arrests."  Id. at 974-75.

---

[12] This is not a case of "how many causes of action can you find in this fact situation?"  See Pendrell v. Chatham College, 386 F. Supp. 341, 345 (W.D. Pa. 1974).  Mr. Gold has not reframed his facts with a new theory.  Rather, he stated a § 1983 claim but did not identify the constitutional provisions implicated.  His First Amended Complaint cured that deficit.

Interaction with police does not trigger Fourth Amendment protection as long as the totality of the circumstances establishes that the individual was free to terminate the interaction and leave. Florida v. Bostick, 501 U.S. 429, 439 (1991).  Under the Fourth Amendment, a seizure of the person occurs only when a police officer, by means of physical force or show of authority, restrains an individual's liberty in some way.  United States v. Sealey, 30 F.3d 7, 9 (1st Cir. 1994) (citing Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)).  For a claim of arrest without probable cause to survive summary judgment, there must be facts (such as the application of handcuffs or other physical restraint) to permit the inference that a reasonable person in Mr. Gold's position would have believed he was under arrest.  See United States v. Acosta-Colon, 157 F.3d 9, 15 (1st Cir. 1998).

Here, there are no facts to permit any such inference – Officer Poccia clearly was using coercion to seize the cell phone, not to arrest or detain Mr. Gold.  Accordingly, I recommend that the Court grant summary judgment on Mr. Gold's claim that his Fourth Amendment rights were violated by an arrest not supported by probable cause.  And if the Court is inclined to consider that Officer Poccia's conduct amounted to a *de facto* detention, I alternatively urge summary judgment in favor of the Coventry police both because, based on the totality of the circumstances, Officer Poccia's conduct (in terms of its minimal impact on Mr. Gold's liberty as long as he relinquished the cell phone) was reasonable and because such conduct is protected by qualified immunity.  Zappa, 819 F.3d at 1006 (threat of arrest to recover property does not transgress Fourth Amendment); see Wesby, 138 S. Ct. at 591 (when arrest based on reasonable inferences from facts confronting officers, no constitutional violation and qualified immunity applies).

C.     **Alleged Unconstitutional Seizure of Data and Interference with Email and Internet Accounts**

19

All claims related to the improper seizure of data (as opposed to the cell phone itself) must be dismissed because there is no evidence that either of the Coventry police officers had anything to do with what happened to the cell phone, or to Mr. Gold's data, computer or email accounts after the cell phone was returned to Sheila Gold. To the contrary, it is undisputed that Officer Poccia asked Mr. Gold for his password and Mr. Gold refused to provide it. Therefore, it is undisputed that the Coventry police left the scene knowing that the password had not been provided so that pass-word-protected personal contents would remain inaccessible to Sheila Gold and ShelaLara. Further, Mr. Gold has no evidence to suggest that Sheila Gold and ShelaLara were acting in concert with police; rather, he has admitted that the Coventry police had nothing to do with this aspect of his claim. See Smith v. Walsh, 833 F. Supp. 844, 853 (W.D. Okla. 1993) (police response to citizen complaint insufficient as matter of law to permit inference of invidious conspiracy). Accordingly, I recommend that the Court grant summary judgment in favor of Defendants on Mr. Gold's claim that he was the victim of an unconstitutional seizure of data and interference with his email and internet accounts.

This claim is also time barred. In the instant case, Mr. Gold first mentioned the accessing, hacking and conversion of his data in his First Amended Complaint, which was filed on December 11, 2017, more than three years after the February 20, 2014, incident. See Walden III Inc. v. Rhode Island, 576 F.2d 945, 947 (1st Cir. 1978) (court applies three-year limitations period for § 1983 claim of illegal search and seizure). There is simply no reference to any of the facts constituting this "conduct, transaction or occurrence" in the original complaint. See ECF No. 1-3. Nor can Mr. Gold argue that this claim is based on newly discovered facts – to the contrary, these events were fully developed by 2015 at the latest, when they were recounted in his unsuccessful counterclaim in the ShelaLara Case. Accordingly, the doctrine of relation back

20

does not apply.  Fed. R. Civ. P. 15(c)(1)(B); see Marsman, 719 F. Supp. at 1143 (because original complaint alleged only facts supporting race discrimination, out-of-time amendment to add facts supporting claim of disability discrimination does not relate back).  Based on the applicable statute of limitations, I recommend that summary judgment end this Fourth Amendment claim.

> **D.** **Alleged State Law Claims – Extortion, Larceny, Computer Crimes and Conspiracy to Commit Crimes**

Mr. Gold has sued the Coventry police officers for what he claims are the criminal actions of Sheila Gold and ShelaLara in hacking into his computer and accessing his private email and other accounts.  He invokes Rhode Island criminal statutes prohibiting extortion and larceny (R.I. Gen. Laws §§ 11-41-1; 11-42-1.1; 11-42-2), the computer theft statute (R.I. Gen. Laws §§ 11-52-4, 4.1, 8) and conspiracy to commit criminal offenses (R.I. Gen. Laws § 11-1-6).  Like the constitutional claim based on the improper seizure of data, these state law claims should be dismissed for an array of reasons, starting with the dearth of evidence permitting an inference that any of the Coventry police officers had anything to do with what happened after the locked cell phone was returned to Sheila Gold.  Further, some of the claims (R.I. Gen. Laws §§ 11-41-1; 11-42-1.1; 11-42-2) must be dismissed because the state law does not create a private right of action.  Finally, like the constitutional claim based on seizure of this data, these claims are time barred.  In this case, hacking and theft of data were not mentioned until the First Amended Complaint was filed on December 11, 2017, more than three years after the February 20, 2014, incident.  R.I. Gen. Laws § 9-1-25 (three-year limitation period for suits against municipalities and their subdivisions).  As discussed above, with no reference to this "conduct, transaction or occurrence" in the original complaint, the doctrine of relation back does not apply.  Fed. R. Civ.

21

P. 15(c)(1)(B). Based on the foregoing, including the applicable statute of limitations, I recommend that summary judgment also end these state-law claims.

## IV.    CONCLUSION

Accordingly, I recommend that Defendants' motion for summary judgment (ECF No. 14) be granted in part and denied in part as follows. I recommend that the Court enter judgment against Plaintiff Andrew Gold and in favor of Defendants David Nelson, Randy Polion and the Town of Coventry through its Finance Director, Robert Thibeault, and that these Defendants be dismissed from the case. I further recommend that the Court enter judgment against Plaintiff Andrew Gold and in favor Defendants James Poccia and Benjamin Sedam on the claims arising under 42 U.S.C. § 1983 based on seizure of the person (false arrest) and seizure of data and computer hacking, as well as on all of the claims arising under state law. As to the remaining claim arising under 42 U.S.C. § 1983 based on seizure of the cell phone, I recommend that the motion be denied.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party. See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision. See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
June 29, 2018